## 6036. O'NEAL v. THE STATE.

The evidence was sufficient to authorize the conviction.

DECIDED DECEMBER 22, 1914.

Accusation of fornication and adultery; from city court of Miller county—Judge Geer. October 26, 1914.

*B. B. Bush,* for plaintiff in error.

*N. L. Stapleton, solicitor,* contra.

WADE, J. C. F. O'Neal, alias Pat O'Neal, was tried under an accusation charging him with adultery and fornication, and with living in a state of adultery and fornication with one Evie King, he being a married man and the said Evie King being a single woman. The jury found a general verdict of guilty. The defendant filed a motion for a new trial on the general grounds alone; and to the order overruling the motion he excepted.

According to the evidence for the State, Evie King, a widow and a lewd woman, lived with her children about three miles away from the home of the defendant. He was a married man, engaged in the business of enlarging pictures. On many occasions he was seen by different witnesses at her house. One witness testified that she (the witness) daily drove her calves to a pasture near Evie King's house, and, when going for the calves, saw the defendant at the house several times about sundown, and that she "would again see him there the next morning, just after sunup," when carrying the calves back to the pasture; that she saw him there several times in the summer, bareheaded and in his shirt-sleeves, but did not know whether he spent the night there or not, as she saw him there only in the daytime; that on one occasion she went to the house when Evie King's baby was born, and while Evie King was confined to her bed, in the year 1914, and the defendant was there and no one else, when the witness arrived; that the defendant left before the witness did, and as he took his departure he gave Evie King some money and told her that this amount "would keep her until he could get back, and that when he came back again he would bring her some more money." Another witness testified that on one occasion, while the defendant was being conveyed around by him in a buggy, collecting for pictures enlarged for various people, the defendant got out of the buggy near Evie King's house, "right at the end of the lane in front of her house, and went towards her house,"

but the witness was unable to say whether he went to the house or not; that the defendant on that occasion told him not to tell the wife of the witness where he (the defendant) spent the night, though the witness did not know where the defendant stayed; that the defendant said that the wife of the witness was a good woman, "and she had heard so much on him [the defendant] that he was ashamed to face her." The defendant never admitted to this witness that he had any improper relations with Evie King, but he did tell the witness that he and his wife did not get along well together, and that if his wife recovered from the birth of her baby, born in July, 1914, he intended to send her back to Florida to her family, get a divorce, and marry Evie King; that the defendant did not stay at home regularly, but came home only about two or three times a week. Another witness testified that he saw the defendant at the house of Evie King twice; that he delivered a picture to her, and once he carried a picture to the defendant at her house to be enlarged, as the defendant had instructed the witness to bring it to him, and he knew the defendant was there; that it was daytime when the witness saw him there. It appeared, from the testimony of another witness, that during the summer of 1914, the defendant arranged to have the witness bring from the town of Babcock some provisions that the defendant said he wanted the witness to take to Evie King, saying that her brother had given him $2 and asked him to buy her some provisions with the money; that the witness purchased the articles and carried them to his house, where the defendant came for and obtained them, stating that he was going to take them to Evie King. All of these witnesses and others testified to the bad character of Evie King. She testified as follows: "I have never had sexual intercourse with Pat O'Neal in my life, and neither have I been prosecuted for adultery." This appears from the record to have been her entire testimony. The defendant made the following brief statement: "I have never had anything to do with Evie King. It is true that I have been to her house several times. I have delivered to her an enlarged picture of her dead husband, and I have had her to do washing for my family, for which I paid her. Of course I know that I have been accused of her, but nothin' doin'."

It is true that "to warrant a conviction on circumstantial evidence, the proved facts must not only be consistent with the hy-

pothesis of guilt, but must exclude every other reasonable hypothesis save that of the guilt of the accused." Penal Code, § 1010. It is urged with considerable force by counsel for the plaintiff in error that the testimony in this case does not exclude every other reasonable hypothesis than that of the guilt of the accused; and the cases of *Moore* v. *State,* 8 *Ga. App.* 113 (68 S. E. 116), *Thompson* v. *State,* 5 *Ga. App.* 7 (62 S. E. 571), and *Long* v. *State,* 5 *Ga. App.* 176 (62 S. E. 711), are relied upon to support this contention. In the *Moore* case, supra, in which this court held that the evidence was not sufficient to support a conviction, it appeared that the woman with whom it was alleged the adultery was committed was living apart from her husband, at the house of the defendant, where she was employed to do household work and to wait on his wife, an invalid, and, while so employed, gave birth to children; that the defendant and a physician were the only persons present in the room with the woman when her children were born, and the defendant procured and paid for the services of the physician, and that, while discussing this woman with a witness, who advised him to get rid of her, he told the witness that he wanted to do so, but was afraid, as he did not know what she might swear, and further told the witness that his wife was an invalid and that he needed somebody to help her, and "that she was unable to do family duties; also that he was a healthy man." The evidence showed that adult sons of the defendant lived in the same house, and in his statement to the jury he denied that he ever had sexual intercourse with the woman, and no one testified to the contrary. In the *Thompson* case, supra, it appeared that the defendant was a married man, living apart from his wife and having in his charge four children, the offspring of a previous marriage; that he was a very poor man, and was compelled to labor daily in the field, assisted by such of his children as were able to work; that his children were small, the oldest a boy of twelve years, and they were unable to keep house for him; that having no person to take charge of his house and give proper care and attention to his children, and the children being too young to care for themselves or for each other, he hired the woman in question to keep his house and care for his children, and she lived in this house alone with him and the children two or three years; that she had one bastard child before she came to the house, and while living in the house gave birth to another, and that she

remained in the house about a year after the birth of the last child; that it was a large country house, with several bedrooms, and men were in the habit of visiting at the house. There was no testimony as to anything wrong or improper between the defendant and this woman. A jury convicted him, and this court set aside the verdict, for the reason that the conviction depended alone upon circumstantial evidence, and the circumstances proved were not sufficient to exclude every other reasonable hypothesis. Hill, C. J., speaking for the court, said, in substance, that the fact that the woman was a lewd woman when she was employed by the defendant, and that she continued her immoral conduct while an inmate of his house, and that he nevertheless retained her in his household, furnished ground for suspicion, but that it was probable that on account of his extreme poverty and the care of his four little children, he had only a limited range of selection; and that while there was opportunity for the commission of the offense charged, the evidence showed that other men visited the house, who probably knew of the character of the woman, and there was no evidence to indicate that the woman "was exclusive in the bestowal of her favors on the defendant," and the fact that she gave birth to an illegitimate child while living in the house with him, while doubtless regarded by the jury as a strong circumstance indicating his guilt, must be considered inconclusive, in view of the social intercourse of the woman with other men who came to the house. In the *Long* case, supra, the evidence against the defendant showed that he was found in the same room with an unmarried woman about nine o'clock at night, that the lamp in the room was turned low, and neither of them had on shoes, and that an inside door, connecting with an adjoining room, as well as an outside door, was closed. There were two beds in the room, and the cover had not been turned down on either, but one bed was somewhat rumpled, and the pillow was indented and felt warm. The woman testified that neither on the occasion in question nor at any other time had the defendant had carnal knowledge of her person; and there was no evidence that she was a lewd woman or a woman of doubtful reputation. A majority of the court held that the evidence was insufficient, on the theory that the circumstantial evidence did not exclude an inference that the parties were about to commit the offense alleged in the accusation, and had not committed it, when interrupted by the

arrival of the two policemen, and that this inference was just as reasonable as an inference that the act had already been consummated; and the decision was based also on the absence of any testimony showing the bad character of the woman in question and thus raising the presumption that the purpose of the defendant's presence with her was to commit the act of adultery and fornication. From this judgment Powell, J., dissented, saying: "That rumpled bed and warm pillow, to my mind, speak more strongly of consummation experienced than of mere preparation thwarted." The majority of the court said: "We recognize the well-settled rule that illicit intercourse may be inferred from the presence of a man at a house of ill fame, or from his exclusive presence in a closed room with a woman of an established reputation for lewdness. The evidence in this case, however, does not show that the house in question bore an evil reputation, or that the female bore other than a good reputation."

The case under consideration may easily be distinguished on its face, in various ways, from the three cases above discussed. In the *Long* case it did not appear that the woman had an established reputation for lewdness, whereas in the present case it appears from the testimony of a number of witnesses, and without denial on the part of the defendant in his statement or on the part of the woman Evie King in her testimony, that her character for lewdness was unquestionably established; and the testimony shows that he was in her exclusive presence at the house on one occasion at least, and was seen there on numerous other occasions. In the *Moore* case it appeared that adult sons of the defendant lived in the same house with him and his wife and the lewd woman, and it did not appear that he was ever alone in the house with the woman. In the *Thompson* case it appeared that other men frequented the house, and there was no evidence of improper conduct between the defendant and the lewd woman he had engaged as a housekeeper, nor was there any special thing to indicate that the defendant was the recipient of her favors. In both the *Thompson* and the *Moore* cases the defendants had rational explanations of the presence of the lewd woman in their homes, for the women were there as hirelings, rendering necessary and legitimate services, in the one case as a housekeeper and as a nurse to the sick wife of the accused, and in the other as a housekeeper and in caring for the defendant's young and

helpless children; but here the defendant was repeatedly seen at the
house of the lewd woman, three miles away from his own domicile,
often in his shirt-sleeves and with his hat off, very early in the
morning and also quite late in the day—about sundown, apparently
very much at home, when there was no necessity nor any convincing
reason for his presence. Likewise, he was seen at her house shortly
after the birth of her child, during the summer of the present year,
by a witness who testified that there was no one else but the de-
fendant and Evie King in the house when the witness arrived, and
that on that occasion the defendant gave the King woman some
money "to keep her up until he could get back," and voluntarily
promised to give her more when he returned. Such evidence would
raise a grave suspicion even if the woman accused with the defend-
ant had been a woman of previously spotless reputation, but when
the fact is considered that she was not only generally known as a
lewd woman, but that the defendant himself, according to his own
admission to one witness for the State, was a man of lewd char-
acter, so conscious of his filthy life that he felt ashamed to even face
a decent woman, it seems to us that the circumstances in evidence
could not be explained except on the theory that the defendant was
guilty, and that no other hypothesis would account for all the facts
proved. It will be recalled that the defendant had purchased sup-
plies for the woman, claiming that the money therefor had been
furnished by her brother, and that he himself came to the house of
the man, who had brought the provisions out from town, and said
he would carry them to the woman and that no reason for his in-
terest and efforts in her behalf is assigned; and that another wit-
ness, who had been told by the defendant to bring a picture to him
to be' enlarged, sought for and found him at the house of the woman
"because he knew he was there," and not, so far as the record dis-
closes, because the defendant said he would be there, but apparently
because the witness knew of the frequency of his visits there. Then,
in connection with all the other evidence, the shameless statement,
alleged to have been made by the defendant and not denied by him
on the stand, that he proposed to send his wife back to her people
in Florida as soon as she sufficiently recovered from her recent con-
finement, and then to get a divorce and marry Evie King, a woman
notoriously lewd, coupled with the proof that he did not stay at
home regularly, and came home only two or three times a week,

makes it impossible to reach any other reasonable conclusion than that the defendant was guilty as charged. He stayed somewhere, and if not at home, where else, under the evidence, except at the home of the King woman; and if he stayed there, why? The explanation given by the defendant, that his sole business at the house of the woman was to deliver to her an enlarged picture of her dead husband, and to see her about some washing for his family, for which he paid her, is hardly an explanation at all, since neither reason assigned by him would be sufficient to explain his frequent visits to the home of the woman, who lived three miles away from his house, as he could scarcely have gone so often to her house in order to enlarge only one picture. Nor could his presence when she was confined in child-bed be explained by the pretense that he was there arranging about family washing. Nor does it appear reasonable that he was then paying her for washing previously done, since he did not then say, and even in his statement at the trial did not claim, that he was paying her for washing, and no amount was then or ever named that he owed her or would pay her, but he simply gave her some money and told her that this "would keep her up until he got back," and that "when he came back he would bring her some more money;" which would not indicate that he was thereby seeking to discharge a legitimate debt of any certain amount to the woman.

In cases of this character it is generally impossible to have direct evidence as to the actual commission of the crime, since such crimes are seldom ever committed upon the housetops, in the market-places, or elsewhere in the gaze of the public, but nearly always with stealth and secrecy; and hence, while there are not different rules of evidence for this crime than for another, the courts have recognized the doctrine as sound and safe, where the evidence discloses that a man was so associated with a woman or in such a position with her at a particular time as that, according to all ordinary human experience, sexual intercourse between them would naturally follow, a conviction therefor might be sustained, notwithstanding the circumstances do not absolutely compel the conclusion that he was guilty; and especially is this true where the woman is of loose character, as in this case. In short, a knowledge of ordinary human conduct, under circumstances tending to indicate the guilt of one accused of adultery or fornication, is considered as supplying to

some degree the place of direct evidence, which might otherwise be considered necessary to establish legally the conclusion of guilt.

In *Sutton* v. *State,* 124 *Ga.* 815-820 (53 S. E. 381), the Supreme Court said: "It is seldom that the act of adultery or fornication can be proved by direct evidence. Usually it must be established by circumstantial evidence or inferred from a chain of circumstances proved. Whichever form the proof may take, it is sufficient if the offense is proved beyond a reasonable doubt. Among the circumstances from which it has been held that guilt may be inferred is where the proof shows that a married man associated with a known prostitute. . . Or when a married man is seen to enter a house of prostitution and is known to be in the room with a common prostitute for a sufficient time to commit the act, adultery may be inferred. . . Of course these circumstances are subject to explanation, the jury ultimately determining what was the fact." It is true that in the case of *Lightner* v. *State,* 126 *Ga.* 563 (55 S. E. 471), where the defendant, a white man, traveling with his child and a mulatto woman, whom he claimed to be his nurse, spent several nights at residences on the way, and on two occasions the three slept in one room, and on one occasion there were two beds in the room and both beds appeared the next morning to have been occupied, and on another occasion there was but one bed, while a pallet was made before the fire for the woman, since the defendant said he preferred that she occupy the same room with him and the baby, a conviction was set aside on the ground that the evidence only afforded room for suspicion, since there was no direct evidence showing criminal intercourse between the defendant and the woman, and the circumstances were not such as to exclude every other reasonable hypothesis than that of the guilt of the accused. But in that case it will be observed that there was no proof that the woman was a prostitute, and in fact she may have been one whose age and long service in the family of the defendant may have negatived the probability of illicit relations between them. Also, the defendant in that case, as in the *Moore* and *Thompson* cases, supra, assigned a rational reason why he carried the woman around with him and why he occupied the same room with her, since he claimed that she was employed to take care of his infant child, and her presence at all times in the room with the baby may be reasonably assumed to have been necessary.

In the cases of *Eldridge* v. *State,* and *Starke* v. *State,* 97 *Ga.* 192-193 (23 S. E. 832), respectively (in which the evidence was practically the same), it appeared that Rachel Eldridge, a married woman, and Anderson Starke, a married man, were both employed on the place of Wilhite; that there was but one cabin on the place for them to stay in, which was given to the defendant Rachel Eldridge to live in, but Starke lived there with her, there being nowhere else on the place for him to live; that his duties called him to be on the place; that the house was only one room, twelve feet square, and contained but one bed; and that Starke had "frequently gone in the house at night and come out in the morning." Starke testified, in the case against the woman, that he frequently occupied the room with her, but never had sexual intercourse with her; that there was nowhere else on Wilhite's place to stay, and his duties required his presence there; that his wife lived three miles away, and he could not go there at night and be back next morning in time for work; that the woman slept in her bed in the room, and he slept on a pallet on the other side of the room. In these two cases the majority of the court held that the evidence, though entirely circumstantial, was sufficient to warrant the conviction of the defendants, though Chief Justice Simmons dissented on the ground that "the verdict was predicated merely on suspicion and against the positive evidence of a legally credible unimpeached witness." It will be noticed that in these cases, where the conviction was sustained by a majority of the court, that Starke had a reason which might have been considered adequate to explain his frequent occupancy of the same house with the woman, and also might have explained the fact that he had been frequently seen going in the house at night and again coming out of it the next morning; and besides there was no evidence that the woman was of lewd character. In the case now under consideration the defendant was frequently seen at the house of a woman who was a known prostitute, very early in the morning and also about sundown, with, as we have suggested above, no really satisfactory explanation of his presence there. If the evidence in these two cases justified a conviction for a specific act of adultery, it appears to us that the evidence in the case under consideration would warrant the jury in reaching the conclusion that the defendant was beyond a reasonable doubt guilty of living together in a state of adultery and fornication with the

woman named. The jury so found, and we think the finding was not only justified by the evidence, but that the various circumstances proved authorized the inference of the guilt of the accused to the exclusion of every other reasonable hypothesis.

*Judgment affirmed.*