### 6307.  RAMSEY *v.* THE STATE.

No error of law is complained of, and the circumstances proved were amply
    sufficient to exclude every other reasonable hypothesis than that of the
    guilt of the accused.

DECIDED APRIL 20, 1915.

Accusation of adultery and fornication; from city court of Louisville—Judge Phillips.  December 22, 1914.

*Frank Hardeman,* for plaintiff in error.

*J. R. Phillips, solicitor,* contra.

WADE, J.  Preston Ramsey, the accused, was a married man, living on a farm, and Pearl Sims was a married woman living separate and apart from her husband on a different farm, belonging to a different owner.  Pearl's house was a double-pen house with two rooms, one occupied by her and the other by her grandmother; the rooms did not connect, but "you had to go out of one room to the ground to enter the other."  About 11 or 12 o'clock at night, on or about the date named in the indictment against Ramsey, a witness, accompanied by the husband of the woman, passed along the path which led "right by the door" of Pearl's house; the door of her room was open and a lamp was burning on her center table, which enabled the witness to see into the room and observe that there were two beds in the room, and that Pearl Sims and the defendant, neither of whom was undressed, were lying across a bed talking.  Soon thereafter this witness borrowed a bicycle from Ramsey, and Ramsey told him, when he "started to return it that night, to take it to Pearl Sims's house, where he [Ramsey] would be."  The witness took the bicycle, as instructed, to the house of Pearl Sims at night, and when he reached her house it was dark and there was no light in the house; he called and the defendant

came to the door of Pearl Sims's room and opened it; the defendant "had off his clothes—that is, he was in his night clothes," and the witness saw Pearl Sims in bed. The defendant did not come from the other room of the house, but came from Pearl Sims's room, and, "from the light" (evidently made by the defendant after the witness called him, since he stated that there was no light in the house when he called), the witness could see the bed not occupied by Pearl Sims, and observed that the cover thereon was not disturbed. This witness further testified that on another occasion he passed the house of the Sims woman and called, and though he saw no one, he heard the defendant's voice as he answered from the house. The defendant made a statement which occupies but three lines of the record, in which he simply denied any undue or intimate relations with Pearl Sims, and said he had merely been on a visit to her, and never was in bed with her at any time.

It hardly seems necessary, on this statement of facts, to say more than that the circumstances proved appear to us to preclude any reasonable hypothesis of innocence on the part of the accused, who, from the evidence, was present in a dark room, unoccupied by any other person but his alleged paramour; and though, according to his statement, he had come from his own home and family to merely pay a social visit to the woman, he had found it necessary, after his arrival, to remove his clothing and to put on his night-clothes, blow out the light, and innocently (?) entertain his female friend, then reclining at length in bed. Why the defendant thought it necessary to remove his clothing and to blow out the light does not appear, for since the accusation charges him with the commission of the crime of adultery on the 6th day of February, 1914, it is apparent that, according to common knowledge as to the seasons, the weather could not have been so oppressively warm as to require the removal of his outer clothing for comfort merely, nor could the light in the room have been extinguished to guard against attracting mosquitoes or other insects, not troublesome at that time of the year. We are constrained to believe that the defendant on this visit was not exclusively engaged in high-minded discourse with the woman, and that platonic friendship did not account altogether for the situation in which they were discovered. While there is no proof that the woman was a woman of established reputation for lewdness, the facts were nevertheless more convincing

than in the *Long* case, 5 *Ga. App.* 176 (62 S. E. 711) ; for in that case there was a lamp in the room, though turned low, and while neither of the parties had on shoes when interrupted, they were otherwise dressed; there was an inside door, which, though closed, connected with an adjoining room; there were two beds in the room, but the cover had not been turned down on either, though one appeared somewhat rumpled, and the pillow thereon was indented and felt warm. The parties were in a room connected by a door with an adjoining room, in which there were three other persons who knew of the presence of the defendant and the woman in question. In this case, it is true, the grandmother occupied the other room of the two-room cabin, but it does not appear that she was aware of the presence of the defendant in the room with her granddaughter, and it does appear that there was no inside or direct connection between the two rooms, and the room was in total darkness immediately before the defendant opened the door in response to a call from the witness. In the *Long* case, supra, as already stated, the parties were not undressed, though their shoes had been removed, and one of the material reasons which apparently led this court to hold that the evidence in behalf of the State was insufficient to authorize the conviction of the defendant was that "from the proved facts the inference is as likely that the parties were about to commit the offense alleged in the accusation, and were prevented by the arrival of the two policemen, as that the act had already been consummated." Even from this conclusion Powell, J., dissented, on the ground that the "rumpled bed and warm pillow" spoke "more strongly of consummation experienced than of mere preparation thwarted." The circumstances of the case under consideration indicate that the defendant, when he went to the door of the woman's room in his night-clothes, had but just left the bed in which the woman was then seen to be reclining, and that after his short conversation at the door with the witness, he returned to that bed and to the arms of his paramour. Whether the crime had been consummated or not before the witness appeared at the door and called the defendant, no reason appears why it could not have been thereafter consummated during the remainder of the night; and, according to all natural and human probabilities, we are compelled to assume that it was consummated either before or after the arrival of the witness.

The circumstances proved in the case of *Cummings* v. *State,* 14 *Ga. App.* 441 (81 S. E. 366), were by no means as conclusive as those appearing in the present case; and the evidence in this case is fully as satisfactory as in the case of *O'Neal* v. *State,* 15 *Ga. App.* 487 (83 S. E. 861). In the case last mentioned, the defendant did attempt to offer an explanation which was somewhat plausible at least, whereas in the present case the explanation of the defendant, that he was simply visiting the woman, and neither then nor at any time was unduly familiar with her, when considered in the light of the undisputed testimony showing that he was present alone with her, late at night, in a dark room, in his night-clothes, where she was seen to be occupying the only one of two beds in the room that had apparently been used, appears, in the light of human experience and in the absence of any other testimony explaining his presence and accounting for the scantiness of his garb, to be absolutely incredible—especially since the defendant himself did not deny the truth of any of the evidence, and nothing was shown to negative the inference that he remained alone in the room with the woman for the rest of the night.            *Judgment affirmed.*